UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO CARREON,<br><br>Plaintiff,<br><br>v.<br><br>S. ABDUR-RAHMAN, et al.,<br><br>Defendants. | No. 2:17-cv-1292 TLN KJN P<br><br><u>ORDER AND FINDINGS &<br>RECOMMENDATIONS</u> |

I. <u>Introduction</u>

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. Pursuant to the district court's September 28, 2018 order, this action proceeds on plaintiff's Eighth Amendment deliberate indifference claims against defendants Dr. S. Abdur-Rahman and Dr. Lee.[1] On June 17, 2019, defendants filed a motion for summary judgment. Plaintiff filed an opposition, and defendants filed a reply.

As discussed below, the undersigned recommends that defendants' motion for summary judgment be granted in part and denied in part.

////

---

[1] Defendants' motion to dismiss plaintiff's retaliation claims against Dr. Abdur-Rahman was granted, and plaintiff was granted leave to amend to pursue retaliation claims against the doctor based on medical treatment provided or not provided after July 26, 2015. (ECF No. 26 at 7-8.) Plaintiff did not file an amended complaint.

II. <u>Plaintiff's Claims</u>

In his verified complaint, plaintiff alleges that Dr. S. Abdur-Rahman failed to provide adequate medical care for plaintiff's serious medical needs, including failures to (a) timely provide a four-wheel walker, resulting in plaintiff falling and sustaining serious injuries; (b) extend morphine; (c) increase Lyrica; and (d) refer plaintiff to a specialist. (ECF No. 11.) Plaintiff alleges that defendant Dr. B. Lee was aware of plaintiff's serious medical needs, yet failed to ensure that plaintiff received care for plaintiff's serious medical needs, including a failure to provide a walker, and failure to provide adequate pain medication. (ECF No. 1 at 20-24.)

III. <u>Legal Standard for Summary Judgment</u>

Summary judgment is appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure 56 is met. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the nonmoving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." <u>Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp.</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56 advisory committee's notes to 2010 amendments (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.  <u>Celotex Corp.</u>, 477 U.S. at 322.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  <u>Id.</u> at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to

the opposing party to establish that a genuine issue as to any material fact actually exists.  <u>See</u>

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to

establish the existence of such a factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material in support of its contention that such a

dispute exists.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Matsushita</u>, 475 U.S. at 586 n.11.  The opposing party

must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

of the suit under the governing law, <u>see</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986); <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir.

1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

a verdict for the nonmoving party, <u>see</u> <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436

(9th Cir. 1987), <u>overruled in part on other grounds</u>, <u>Hollinger v. Titan Capital Corp.</u>, 914 F.2d

1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not

establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

trial."  <u>T.W. Elec. Serv.</u>, 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

<u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

Civ. P. 56(c).  The evidence of the opposing party is to be believed.  <u>See</u> <u>Anderson</u>, 477 U.S. at

255.  All reasonable inferences that may be drawn from the facts placed before the court must be

drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587; Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By contemporaneous notice provided on June 17, 2019 (ECF No. 39-2), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

IV.  Undisputed Facts[2] ("UDF")

1.  Plaintiff Antonio Carreon is a prisoner in the custody of the California Department of Corrections and Rehabilitation ("CDCR"), who at all relevant times was housed at High Desert State Prison ("HDSP").

2.  Defendant Dr. Abdur-Rahman was at all relevant times employed by CDCR as a Primary Care Physician ("PCP") at HDSP.

3.  Defendant Dr. Lee was at all relevant times employed by CDCR as the Chief Physician and Surgeon at HDSP.

4.  Plaintiff has no formal training in medicine.  (Pl.'s Dep. at 59.)

5.  On June 29, 2015, R. Reed, Physician's Assistant, completed a primary care provider progress note marked "late entry completed after entire chart review."  (ECF No. 19-1 at 12.) Reed charted plaintiff's "new arrival" with history of Parkinson's, "uses carbidopa/levodopa with some relief uses cane for stabilization."  (Id.)  Reed noted plaintiff's resting right hand tremor,

---

[2]  For purposes of summary judgment, the undersigned finds these facts are undisputed, unless otherwise indicated.

and "can walk without cane has parkinson [sic] shuffle." (Id.)  In the diagnosis section, Reed charted that plaintiff's Parkinson's was "at goal;" the plan was to "continue current treatment, physical therapy to help with stability movement, use cane as needed, consider neurology evaluation." (ECF No. 19-1 at 12.)  For neuropathy, continue Lyrica.  (Id.)

6.  On June 29, 2015, a health care services physician request for services form was completed for plaintiff requesting physical therapy for plaintiff's Parkinson's "to help with stability." (ECF No. 41 at 13.)  On July 1, 2015, the request was approved.  (ECF No. 41 at 13.)

7.  On July 23, 2015, plaintiff had an appointment with Dr. Abdur-Rahman, who addressed plaintiff's medical conditions, including, but not limited to, Parkinson's disease, seizure and psychiatric disorders, Hepatitis C, neuropathy of the legs, and high blood pressure. (ECF No. 39-6 at 6-7.)

8.  Dr. Abdur-Rahman noted plaintiff's Parkinson's disease was stable and that plaintiff had been referred through physical therapy to consider a possible neurology evaluation at a later date.

9.  Dr. Abdur-Rahman noted plaintiff's neuropathy of the legs was stable and that plaintiff should continue with the current regimen of Lyrica.  Dr. Abdur-Rahman noted that plaintiff wanted to have the dose increased, but there was no medical indication at that time for such an increase.  Dr. Abdur-Rahman noted plaintiff's disagreement with the doctor's decision, but plaintiff was informed of the availability of the administrative appeal process.

10.  According to plaintiff, Dr. Abdur-Rahman denied plaintiff's request for a walker, stating, "Well, we'll see in the future maybe, you know.  When you get your physical therapy appointment scheduled we'll see how that goes." (Pl.'s Dep. at 53.)

11.  Dr. Abdur-Rahman does not recall, and his notes do not indicate, whether plaintiff requested a walker during the July 23, 2015 appointment.  But Dr. Abdur-Rahman noted that plaintiff self-reported he had been using a cane for one and a half to two years, and that he was recommended to possibly go to a walker.  Dr. Abdur-Rahman understood that the possibility of switching to a walker would be addressed at a later date, after plaintiff's physical therapy appointment.  (ECF No. 39-4 at 2.)

5

12. Dr. Abdur-Rahman does not recall, and his notes do not indicate, any discussion during the July 23, 2015 appointment regarding Morphine or other pain medication. The list of "current medications" does not indicate that plaintiff was prescribed or taking Morphine or other pain medication at that time. Further, nothing in Dr. Abdur-Rahman's notes from such appointment indicate that plaintiff complained of pain or requested Morphine or other pain medication. (ECF No. 39-6 at 6-7.)

13. Dr. Abdur-Rahman does not recall, and his notes do not indicate, any discussion regarding referral to a specialist. But Dr. Abdur-Rahman did note that plaintiff had already been referred through physical therapy to consider a possible neurology (specialist) evaluation at a later date. Dr. Abdur-Rahman understood that the need for a specialist referral would be addressed at a later date, after plaintiff's physical therapy appointment. (ECF No. 39-4 at 2.)

14. During the July 23, 2015 appointment with plaintiff, Dr. Abdur-Rahman also looked at plaintiff's blood results and x-rays, and addressed plaintiff's seizure disorder, Hepatitis C diagnosis, and high blood pressure. (Pl.'s Dep. at 52, 64, 65.)

15. On July 29, 2015, plaintiff saw a physical therapist who recommended plaintiff have six physical therapy visits for his lumbar pain and Parkinson's, and a neurological consult for his Parkinson's. (ECF No. 41 at 13; Pl.'s Dep. at 60.) The physical therapist noted plaintiff's "Tennetti [sic] Balance was 15/26."[3] (ECF No. 41 at 13.)

16. On August 3, 2015, plaintiff completed a health care services request form, requesting to be seen because he was in pain from his back and neck, he gets no pain medication, and for his Parkinson's. (ECF No. 41 at 11.) "Balance starting to get bad." (Id.)

17. On August 5, 2015, plaintiff was seen by RN Garbutt, who assessed plaintiff as follows: "Alt. in mobility R/T Parkinson's ds., used cane -- unsteady gait." (ECF No. 41 at 11.) The RN's plan was follow-up with plaintiff's PCP "as soon as possible -- fall risk." (Id.) The RN wrote she would refer plaintiff to his PCP for "mobility evaluation." (Id.) In the appended musculoskeletal complaint form, the RN wrote that plaintiff "says has not fallen but has stumbled

---

[3] Tinetti Balance is the "Measurement of the degree of impairment in balance. . . ." List of medical rating scales, 2 Attorneys Medical Deskbook § 18:8.

& caught himself. Has obvious marked tremors with erratic head bobbing. Referred to see PCP as soon as possible R/T fall risk. Evaluate current cane use versus walker need." (ECF No. 41 at 12.)

18. Plaintiff saw a physical therapist again on August 12, 2015. (Pl.'s Dep. at 60.)[4]

19. On August 18, 2015, plaintiff submitted a CDCR 1824 Reasonable Accommodation Request, requesting a wheeled walker to help him balance. (ECF No. 41 at 14.) Plaintiff stated he has Parkinson's and was "having trouble balancing with just a cane," and "having trouble walking." (Id.)

20. On August 19, 2015, plaintiff fell in his cell at 16:30. (ECF No. 41 at 17.) The RN progress note states plaintiff arrived in "B Clinic in full c-spine precaution" complaining that he fell in his cell. The RN charted that plaintiff reported he "was turning around and I felt my leg start to give out I fell and hit the cement." (Id.) Plaintiff denied having loss of consciousness or having a seizure.

21. After the fall, plaintiff was transported to Banner Lassen Medical Center and found to have a nondisplaced T1 fracture. (ECF No. 39-4 at ¶ 9; 19-1 at 29.) Upon his return to prison, plaintiff was provided a two week lay-in where his pills and meals were delivered to him in his cell. (Pl.'s Dep. At 68.)

22. On August 25, 2015, Dr. Abdur-Rahman saw plaintiff again. Dr. Abdur-Rahman noted plaintiff appeared for a follow-up visit after sustaining a fall and suffering injuries to his neck and back. (ECF No. 39-4 at ¶ 9.) Dr. Abdur-Rahman charted that plaintiff "states he believes the morphine ER is about to expire" (ECF No. 39-6 at 9), and requested that the morphine be extended a little longer for his back pain (ECF No. 39-4 at 3). Dr. Abdur-Rahman informed plaintiff that the morphine prescription was written for fifteen days, beginning August 20, 2015, so the prescription would not expire until September 4, 2015, another ten days. Dr. Abdur-Rahman did not extend the prescription further. (ECF No. 39-4 at ¶¶ 9-10.)

23. During the August 25, 2015 appointment, plaintiff also raised questions about the use

---

[4] No party provided a copy of the medical record from the August 12, 2015 physical therapy session.

of a cane with Parkinson's.  Dr. Abdur-Rahman noted that plaintiff had been seen twice so far by Physical Therapy for his lower back pain. Dr. Abdur-Rahman recommended to plaintiff that he discuss with his physical therapist whether a cane or a walker would be more suitable with his Parkinson's, and plaintiff agreed with this plan.  (ECF No. 39-4 at ¶ 11.)

24.  The Reasonable Accommodation Panel ("RAP"), consisting of defendant Lee and other nonparties, met on August 26, 2015.  (ECF No. 41 at 16.)[5]  T. Robertson, ADA Coordinator/Designee, reported that there was no medical indication for a walker or a wheelchair at this time; plaintiff was scheduled for six sessions with a physical therapist; pursuant to plaintiff's medical evaluation a wheelchair may be considered in the future; plaintiff was provided with a cane, a vest, and ability to access all programs, services and activities safely; and plaintiff could request the assistance of IDA workers for daily activities as needed.  (ECF No. 41 at 16.)  The RAP response was sent to plaintiff on September 11, 2015.  (ECF No. 41 at 16.)

25. Dr. Abdur-Rahman saw plaintiff again on September 30, 2015, regarding an administrative appeal in which plaintiff requested to receive a wheeled walker with handbrakes and a seat.  Dr. Abdur-Rahman informed plaintiff that the wheeled walker with seat and handbrakes had already been received and therefore his appeal had been partially granted.  Dr. Abdur-Rahman further noted that plaintiff was awaiting a neurology evaluation regarding his Parkinson's disease.  (ECF Nos. 39-4 at ¶ 12; No. 39-6 at 12-13 (Ex. C).)

26.  During the September 30, 2015 appointment, Dr. Abdur-Rahman also addressed plaintiff's request to extend his Morphine prescription.  Plaintiff had been prescribed morphine about six weeks after he fell.  Dr. Abdur-Rahman denied plaintiff's request to refill his morphine prescription, as Dr. Abdur-Rahman did not feel there was a medical indication to continue the morphine.  (ECF No. 39-4 at ¶ 13; No. 39-6 at 12-13.)

27.  Finally, Dr. Abdur-Rahman noted plans for a follow-up, including a neurology

---

[5]  The RAP response notes that on August 19, 2015, plaintiff was sent to the medical clinic where he was evaluated by unidentified medical staff who determined no accommodation was required.  (ECF No. 41 at 16.)  However, "[s]taff cell fed as an interim accommodation[, and] IAP workers are available to assist with daily activities as needed."  (ECF No. 41 at 16.)  On August 20, 2015, plaintiff was interviewed by Correctional Officer Barton.  (ECF No. 41 at 16.)  On August 25, 2015, plaintiff was evaluated again.  (ECF No. 41 at 16.)

assessment, but that there was no medical indication at that time for a neurosurgical evaluation, as plaintiff did not have any disease process that would warrant surgery. However, Dr. Abdur-Rahman noted "will order plan for x-ray cervical, lumbar, and thoracic plain films, to compare to the previous films that were obtained on cervical and lumbar spine." Plaintiff agreed with this plan. (ECF No. 39-4 at ¶ 14; No. 39-6 at 12-13.)

28. Plaintiff received a walker by September 30, 2015. (Pl.'s Dep 60:19-20.)

2016 Claims

29. On January 19, 2016, Dr. Griffith prescribed morphine ER 15 mg, once daily for three days, tapering the dose over the three-day period. (ECF No. 41 at 20.) Dr. Griffith noted plaintiff had an appointment with Dr. Abdur-Rahman on January 22, 2016.

30. On January 22, 2016, plaintiff was seen in the Triage and Treatment Area due to a fall.[6] (ECF No. 41 at 22.) The progress note states that plaintiff reported he "fell out of his wheeled walker and avoided hitting his head." (Id.) At the time, plaintiff was taking Morphine ER 15 mg tablet every day for 3 days (expires January 23, 2016), and Lyrica 75 mg capsules, one capsule twice daily for 90 days (non-formulary approved through May 7, 2016). (ECF No. 41 at 22.) Plaintiff was discharged back to yard. (Id.)

31. On January 27, 2016, Dr. Griffith noted "Ibuprofen 400 mg . . . prn pain . . . 20 tabs, 10 days." (ECF No. 41 at 21.)

Plaintiff's Administrative Appeals

32. On or about July 26, 2015, plaintiff submitted inmate appeal Log No. HDSP HC 15029346. (ECF No. 39-5 at 3, ¶ 9 (Gates Decl.); ECF No. 39-5 at 10-16.) In the appeal, plaintiff complained about Dr. Abdur-Rahman's treatment of him on July 23, 2015, and requested proper pain medication, to be referred to a specialist, and to be seen by a different doctor. Plaintiff was interviewed for the first level review by L. Christensen, Nurse Practitioner on August 7, 2015. (ECF No. 39-5 at 12, 16.) The appeal was partially granted at the first level of review in that plaintiff was seen by a different provider for his appeal, his Lyrica prescription was

---

[6] If there is a second page of this progress note, plaintiff did not provide one. There is no indication on the first page who wrote the progress note. (ECF No. 41 at 22.)

increased to 75 mg, and plaintiff was referred to neurology to evaluate plaintiff's Parkinson's disease, seizure disorder, and neuropathy. Plaintiff was interviewed for the second level review by L. Harrison, Nurse Practitioner, on July 28, 2015. (ECF No. 39-5 at 10.) The appeal was partially granted at the second level of review. The first and second level responses were signed by Defendant Chief Physician and Surgeon Dr. Lee.

33. On or about September 15, 2015, plaintiff submitted inmate grievance log number HDSP HC 15029462. (ECF No. 39-5 at 3, ¶ 10; ECF No. 39-5 at 19-22.) In this appeal, plaintiff requested to be issued a walker with four wheels, handbrakes, and a seat. The appeal was granted at the first level of review on October 21, 2015, and the appeal response was signed by defendant Dr. Lee.

34. After September 29, 2015, plaintiff submitted the following six Health Care Appeals: HDSP HC 16029822, SATF HC 16063013, SATF HC 16063278, SATF HC 16063628, SATF HC 16063572, and HDSP HC 16031095. However, none of these grievances concerned defendant Lee's review of plaintiff's other grievances. (ECF No. 39-5 at 3-4, ¶¶ 11-17; ECF No. 39-5 at 28-131 (Exs. D-I.)

35. In his deposition, plaintiff confirmed that the sole basis for his claims against defendant Dr. Lee is "her role in denying [plaintiff's] 602 appeal." (Pl.'s Dep. At 67.)

V. Alleged Failure to Exhaust – Defendant Lee

   A. Exhaustion Standards

The Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), requires a prisoner challenging prison conditions to exhaust available administrative remedies before filing suit. McKinney v. Carey, 311 F.3d 1198, 1199 (9th Cir. 2002); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Exhaustion is a precondition to suit; exhaustion during the pendency of the litigation is insufficient. McKinney, 311 F.3d at 1199-200. This requirement promotes the PLRA's goal of efficiency by: "(1) 'giv[ing] prisoners an effective incentive to make full use of the prison grievance process'; (2) reducing prisoner suits as

some prisoners are 'persuaded by the proceedings not to file an action in federal court'; and (3) improving the quality of any remaining prisoner suits 'because proper exhaustion often results in the creation of an administrative record that is helpful to the court.'" Nunez v. Duncan, 591 F.3d 1217, 1226 (9th Cir. 2010) (quoting Woodford v. Ngo, 548 U.S. 81, 94-95 (2006)).

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford, 548 U.S. at 90. These rules are defined by the prison grievance process itself, not by the PLRA. Jones v. Bock, 549 U.S. 199, 218 (2007). "[A] prisoner must 'complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court.'" Harvey v. Jordan, 605 F.3d 681, 683 (9th Cir. 2010) (quoting Marella v. Terhune, 568 F.3d 1024, 1027 (9th Cir. 2009)). In California, a grievance must be timely appealed through the third level of review to complete the administrative review process. Harvey, 605 F.3d at 683; Cal. Code Regs. tit. 15, § 3084.1(b). The State of California provides its inmates and parolees the right to administratively appeal ''any policy, decision, action, condition, or omission by the department or its staff that the inmate or parolee can demonstrate as having a material adverse effect upon his or her health, safety, or welfare.'' Cal. Code Regs. tit. 15, § 3084.1(a). In order to exhaust available administrative remedies, a prisoner must proceed through three formal levels of appeal and receive a decision from the Secretary of the CDCR or his designee. Id. § 3084.1(b), § 3084.7(d)(3).

The amount of detail in an administrative grievance necessary to properly exhaust a claim is determined by the prison's applicable grievance procedures. Jones, 549 U.S. at 218. California prisoners are required to lodge their administrative complaint on a CDCR-602 form (or a CDCR-602 HC form for a health-care matter). The level of specificity required in the appeal is described in a regulation:

> The inmate or parolee shall list all staff member(s) involved and shall describe their involvement in the issue. To assist in the identification of staff members, the inmate or parolee shall include the staff member's last name, first initial, title or position, if known, and the dates of the staff member's involvement in the issue under appeal. If the inmate or parolee does not have the requested identifying information about the staff member(s), he or she shall provide any other available information that would assist the appeals coordinator in making a reasonable attempt to identify the staff member(s) in

> question. [¶] The inmate or parolee shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal form, and if needed, the Inmate/Parolee Appeal Form Attachment.

Cal. Code Regs. tit. 15, § 3084.2(a)(3-4).  An inmate has thirty calendar days to submit his or her appeal from the occurrence of the event or decision being appealed, or "upon first having knowledge of the action or decision being appealed."  Cal. Code Regs. tit. 15, § 3084.8(b).

However, the Ninth Circuit has held that "a prisoner exhausts such administrative remedies as are available . . . under the PLRA despite failing to comply with a procedural rule if prison officials ignore the procedural problem and render a decision on the merits of the grievance at each available step of the administrative process."  Reyes v. Smith, 810 F.3d 654, 658 (9th Cir. 2016); see also Franklin v. Foulk, 2017 WL 784894, at *4-5 (E.D. Cal. Mar. 1, 2017); Franklin v. Lewis, 2016 WL 4761081, at *6 (N.D. Cal. Sept. 13, 2016).  Thus, a prisoner's failure to list all staff members involved in an incident in his inmate grievance, or to fully describe the involvement of staff members in the incident, will not necessarily preclude his exhaustion of administrative remedies.  Reyes, 810 F.3d at 658; Foulk, 2017 WL 784894, at *4 ("[T]he court in Reyes found that even though the plaintiff's grievance failed to name two physicians on the prison's three-person pain committee, prison officials were put on notice of the nature of the wrong alleged in the suit -- that the plaintiff was wrongfully denied pain medication."); Lewis, 2016 WL 4761081, at *6 ("[T]o the extent Defendants argue that Plaintiff failed to comply with a procedural requirement by not naming Defendants in [his appeal], this deficiency is not necessarily fatal to Plaintiff's claim pursuant to Reyes"); Grigsby v. Munguia, 2016 WL 900197, at *11-12 (E.D. Cal. Mar. 9, 2016) (appeal pursued through all three levels of review challenged the excessive force incident, and prison officials aware of defendant Baker's involvement).

Nonetheless, for administrative remedies to be exhausted by California prisoners as to defendants who were not identified in the inmate grievance, there must be a "sufficient connection" between the claim in the appeal and the unidentified defendants such that prison officials can be said to have had "notice of the alleged deprivation" and an "opportunity to

resolve it." <u>Reyes</u>, 810 F.3d at 659 (PLRA exhaustion requirements satisfied as to two prison doctors despite not being named in the appeal because there was a sufficient connection between Reyes' appeal based on inadequate pain management, and the two doctors, who served on the prison committee that denied Reyes medication); <u>McClure v. Chen</u>, 246 F.Supp 3d 1286, 1293-94 (E.D. Cal. March 28, 2017) (remedies exhausted even though doctors not named in appeal; prison was placed on notice) ).

An inmate must exhaust available remedies but is not required to exhaust unavailable remedies. <u>Albino v. Baca</u>, 747 F.3d 1162, 1171 (9th Cir. 2014) (*en banc*). "To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'" <u>Id.</u> (quoting <u>Brown v. Valoff</u>, 422 F.3d 926, 936-37 (9th Cir. 2005)). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1858 (2016) (quoting <u>Booth v. Churner</u>, 532 U.S. 731, 738 (2001)).

Failure to exhaust under the PLRA is "an affirmative defense the defendant must plead and prove." <u>Jones</u>, 549 U.S. at 204. It is the defendant's burden to prove that there was an available administrative remedy, and that the prisoner failed to exhaust that remedy. <u>Albino</u>, 747 F.3d at 1172. "Once the defendant has carried that burden, the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." <u>Id.</u> If the court concludes that the prisoner failed to exhaust available administrative remedies, the proper remedy is dismissal without prejudice. <u>See</u> <u>Jones</u>, 549 U.S. at 223-24; <u>Lira v. Herrera</u>, 427 F.3d 1164, 1175-76 (9th Cir. 2005).

B. <u>Discussion</u>

In his complaint, plaintiff alleges that defendant Lee had actual knowledge of plaintiff's medical issues based on her review of appeals HDSP-HC-15029346 and HDSP-HC-029462, as well as her role in CDC 1824 Log # B-15-02207. It is undisputed that plaintiff filed no grievance specifically challenging the acts or omissions of defendant Lee.

Defendants argue that in order to exhaust plaintiff's claim against defendant Lee, plaintiff was required to submit and exhaust an appeal about defendant Lee's alleged improper review of plaintiff's administrative appeals. However, defendants provide no legal authority requiring a prisoner to separately appeal an appeal reviewer's alleged failure to investigate or appropriately address the medical claims raised in the underlying appeal. Here, two of plaintiff's administrative appeals challenging his medical care are relevant to this case, and defendant Lee reviewed both appeals. Plaintiff named defendant Lee as a defendant based on her alleged failure to take appropriate action on the medical claims brought to her attention through the medical appeals - Dr. Lee had an opportunity to address plaintiff's underlying medical claims during the administrative review process. While it is clear that plaintiff is required to exhaust claims concerning his medical care, the undersigned is unaware of any authority requiring a prisoner to then file another administrative appeal challenging an appeal reviewer's alleged failure to take additional steps to address the same medical care challenged in the underlying administrative appeal. Indeed, requiring prisoners to do so would result in a circular filing of appeals, and would appear to risk having such appeal rejected as raising the same medical claims raised in the initial appeal. The undersigned finds that defendant Lee's role in reviewing the underlying claims is a sufficient connection between the claim in the appeal and the unidentified Dr. Lee such that prison officials can be said to have had notice of the alleged deprivation and had an opportunity to resolve it through the appeals process. Defendants' motion should be denied as to those claims raised in the two administrative appeals addressed by defendant Dr. Lee.

However, as to plaintiff's challenge based on Dr. Lee's role on the September 2015 RAP, plaintiff must exhaust administrative appeals raising such challenge. As noted on the RAP form, plaintiff was required to complete a CDCR 602-HC if he disagreed with "a health care decision made prior to or during the CDCR 1824 process." (ECF No. 41 at 16.) Plaintiff did not file an administrative appeal challenging the September 2015 decision by the RAP. (ECF No. 39-5 at 3-124.) Thus, defendant Lee is entitled to summary judgment on this claim.

////

////

VI. <u>Alleged Deliberate Indifference - Medical Claims</u>

    A. <u>Eighth Amendment</u>

While the Eighth Amendment of the United States Constitution entitles plaintiff to medical care, the Eighth Amendment is violated only when a prison official acts with deliberate indifference to an inmate's serious medical needs. <u>Snow v. McDaniel</u>, 681 F.3d 978, 985 (9th Cir. 2012), <u>overruled in part on other grounds</u>, <u>Peralta v. Dillard</u>, 744 F.3d 1076, 1082-83 (9th Cir. 2014); <u>Wilhelm v. Rotman</u>, 680 F.3d 1113, 1122 (9th Cir. 2012); <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006). Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." <u>Wilhelm</u>, 680 F.3d at 1122 (citing <u>Jett</u>, 439 F.3d at 1096); <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1991), <u>overruled on other grounds by</u> <u>WMX Techs., Inc. v. Miller</u>, 104 F.3d 1133 (9th Cir. 1997) (<i>en banc</i>).

To establish "deliberate indifference" to such a need, the prisoner must demonstrate: "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." <u>Jett</u>, 439 F.3d at 1096. Deliberate indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." <u>Id.</u> (citations omitted). To establish a claim of deliberate indifference arising from delay in providing care, a plaintiff must show that the delay was harmful. <u>See</u> <u>Berry v. Bunnell</u>, 39 F.3d 1056, 1057 (9th Cir. 1994); <u>McGuckin</u>, 974 F.2d at 1059. "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." <u>Jett</u>, 439 F.3d at 1096; <u>see also</u> <u>McGuckin</u>, 974 F.2d at 1060. The defendant must have been subjectively aware of a serious risk of harm and must have consciously disregarded that risk. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 845 (1994).

An "isolated exception" to the defendant's "overall treatment" of the prisoner does not state a deliberate indifference claim. <u>Jett</u>, 439 F.3d at 1096. Similarly, "mere malpractice, or even gross negligence" in the provision of medical care does not establish a constitutional

violation. <u>Wood v. Housewright</u>, 900 F.2d 1332, 1334 (9th Cir. 1990); <u>see also</u> <u>Farmer</u>, 511 U.S. at 835 (deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety'") (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 319 (1986)); <u>Wilhelm</u>, 680 F.3d at 1123 (a "negligent misdiagnosis" does not state a claim for deliberate indifference).

In addition, "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference." <u>Snow</u>, 681 F.3d at 987 (citation omitted); <u>Wilhelm</u>, 680 F.3d at 1122-23 (citing <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." <u>Snow</u>, 681 F.3d at 988 (citing <u>Jackson</u>, 90 F.3d at 332) (internal quotation marks omitted). In other words, so long as a defendant decides on a medically acceptable course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. <u>Jackson</u>, 90 F.3d at 332.

B. <u>Discussion</u>

1. <u>Serious Medical Need</u>

Defendants do not appear to dispute that plaintiff suffers from serious medical needs. Medical records demonstrate plaintiff suffers from serious medical conditions, including Parkinson's disease, seizure disorder, psychiatric disorder, Hepatitis C, neuropathy of the legs, and high blood pressure.

2. <u>Deliberate Indifference</u>

*Was defendant Dr. Abdur-Rahman deliberately indifferent?*

As set forth above, plaintiff alleges that Dr. Abdur-Rahman failed to timely provide a walker; (b) extend morphine; (c) increase Lyrica; and (d) refer plaintiff to a specialist.

(a) <u>Failure to timely provide a four-wheel walker</u>

Plaintiff alleges that Dr. Abdur-Rahman's failure to provide a four-wheel walker resulted in plaintiff falling and sustaining serious injuries. In his opposition, plaintiff argues that physical

16

therapy recommended plaintiff receive a walker on the first visit "on July 29, 2015 via E-mail." (ECF No. 41 at 2.)  Plaintiff claims that on August 12, 2015, the physical therapist explained "[Tinetti] balance of 15/26 high risk fall" but Dr. Abdur-Rahman did not act on it until after plaintiff fell.  Plaintiff argues such delay demonstrates the doctor's deliberate indifference to an impending risk of harm that was "easily preventable."  (ECF No. 41 at 2.)

The record confirms that plaintiff did not see physical therapy until July 29, 2015; thus, Dr. Abdur-Rahman did not have benefit of such report at plaintiff's July 23, 2015 medical visit. In his deposition, plaintiff claims Dr. Abdur-Rahman denied plaintiff's request for a walker, stating "Well, we'll see in the future maybe, you know.  When you get your physical therapy appointment scheduled we'll see how that goes."  (Pl.'s Dep. at 53.)  The doctor's medical record confirms that plaintiff told Dr. Abdur-Rahman that plaintiff had used a cane for a few years and was recommended to possibly go to a walker.  (ECF No. 39-6 at 6.)  Even assuming, arguendo, that Dr. Abdur-Rahman denied plaintiff a walker on July 23, 2015, plaintiff's recollection of the doctor's statement comports with Dr. Abdur-Rahman's understanding that the possibility of switching to a walker would be addressed at a later time, after plaintiff's physical therapy appointment.  Plaintiff adduces no competent medical evidence demonstrating that not providing plaintiff a walker on July 23, 2015, when plaintiff was going to be evaluated by physical therapy, was medically unacceptable under the circumstances.  Plaintiff's personal disagreement with the doctor's decision constitutes a difference of opinion not rising to the level of deliberate indifference.

In his deposition, plaintiff claims that at both the July 29 and August 12 sessions of physical therapy, the physical therapist said he "emailed the doctor about me getting a walker." (Pl.'s Dep. at 60.)  In his opposition, plaintiff refers to an e-mail "explaining [Tinetti] balance of 15/26 high risk fall."  (ECF No. 41 at 2.)  However, plaintiff did not provide a copy of any email, a declaration from the physical therapist, or a copy of the August 12, 2015 physical therapy report.  Moreover, the medical record from the July 29, 2015 session does not mention a walker or state that plaintiff was at high risk of falling.  (ECF No. 41 at 13.)  Such record notes plaintiff's Tinetti balance was 15/26, but plaintiff provides no competent medical evidence explaining what

a Tinetti balance assessment is, or what the score of 15/26 means from either the physical therapist's or other medical expert's perspective. Thus, the court cannot credit plaintiff's claim that physical therapy put Dr. Abdur-Rahman on notice that plaintiff was at high risk of falling prior to plaintiff's August 19, 2015 fall because it is not supported by competent medical evidence.

Dr. Abdur-Rahman did not see plaintiff again until August 25, 2015. It is undisputed that during this visit, plaintiff raised questions about the use of his cane with Parkinson's. The doctor noted plaintiff had already been seen twice by physical therapy for plaintiff's lower back pain, and recommended plaintiff discuss with the physical therapist whether a cane or walker would be more suitable with plaintiff's Parkinson's, and plaintiff "agreed with this plan." (ECF Nos. 39-4 at 3; 39-6 at 9-10.) There is no notation on the medical record that plaintiff objected that physical therapy had already recommended plaintiff receive a walker; rather, the medical record states that plaintiff agreed with the plan. Plaintiff points to no deposition testimony attesting to such objection. As noted above, plaintiff submitted no competent medical evidence demonstrating that physical therapy recommended plaintiff receive a walker.[7]

The record does not reflect who ordered the walker or on what date. But it is undisputed that plaintiff received the walker by September 30, 2015.

On this record, the undersigned cannot conclude that Dr. Abdur-Rahman was deliberately indifferent by failing to earlier provide plaintiff with a walker. Rather, the record reflects that the doctor recommended plaintiff discuss such mobility issues with his physical therapist. Plaintiff proffers no competent medical evidence that deferring the question of a walker versus a cane to physical therapy was a medically unacceptable course of treatment.[8]

---

[7] Plaintiff submitted a September 23, 2015 memo from Steve Fama, a lawyer with the Prison Law Office, who claimed that a physical therapist on September 14, 2015 concluded plaintiff presented a "high fall risk," and had discussed plaintiff's need for a walker with an unidentified physician as documented on August 31, 2015. (ECF No. 41 at 19.) However, because Mr. Fama is not a doctor, the court cannot credit his memo in evaluating plaintiff's deliberate indifference claim. Moreover, plaintiff did not provide a copy of the September 14, 2015 physical therapy report, or any document from August 31, 2015.

[8] Later, plaintiff fell out of his walker. (ECF No. 41 at 22.) Thus, as defendants argue (ECF No.

18

(b) & (c) Failure to increase or extend medications

The record demonstrates that plaintiff was prescribed Lyrica for his neuropathic pain and was later prescribed morphine to treat pain following his fall.

### July 23, 2015 Visit

At the time of the July 23, 2015 visit with defendant Dr. Abdur-Rahman, plaintiff was prescribed 25 mg capsule of Lyrica twice a day for pain.[9] (ECF No. 39-6 at 6.) Plaintiff requested that the Lyrica prescription be increased. Dr. Abdur-Rahman charted that there was no medical indication to increase the dose, noting that the "[m]edication was apparently started not that long ago." (ECF No. 39-6 at 7.) The doctor also charted that plaintiff's seizure disorder, Parkinson's disease, and neuropathy of the lower extremities were all "stable" conditions. (Id.) The doctor opined that there was no medical indication to increase the Lyrica at that time. (ECF No. 39-4 at 2.)

Dr. Abdur-Rahman does not recall any request for morphine or other pain medication. (ECF No. 39-4 at 2.) The medical record from the July 23, 2015 visit notes that plaintiff was being seen for a "cross-coverage sick call followup visit on B Yard," and does not reflect that plaintiff requested morphine or complained of pain, other than his request to increase his dose of Lyrica. (ECF No. 39-6 at 6.) In his verified pleading, plaintiff declares the doctor "refused" to "extend morphine," and left plaintiff with "futile pain medication (Tylenol)." (ECF No. 1 at 7.) In his opposition, plaintiff does not address the July 23, 2015 visit. (ECF No. 41, *passim*.)

Plaintiff provided no competent medical evidence demonstrating that he should have been prescribed more pain medication. Even assuming the doctor refused to prescribe morphine, Dr. Abdur-Rahman continued plaintiff's Lyrica prescription and provided Tylenol. Thus, defendant Dr. Abdur-Rahman did not act with deliberate indifference simply by refusing to increase plaintiff's medication at that time. See McGuckin v. Smith, 974 F.2d 1050 (9th Cir.1992) (a defendant "must purposefully ignore or fail to respond to a prisoner's pain or possible medical

---

39-1 at 12), the lack of a walker was not the cause of plaintiff's fall in his cell on August 19, 2015.

[9] The medical record reflects plaintiff was not prescribed morphine on July 23, 2015.

need in order for deliberate indifference to be established."). Dr. Abdur-Rahman's conservative approach to plaintiff's medical treatment on July 23, 2015, fails to demonstrate deliberate indifference.

### August 25, 2015 Visit

By August 25, 2015, plaintiff had been prescribed morphine after he fell, and his Lyrica prescription had increased to 75 mg twice a day. Contrary to plaintiff's contention that his morphine prescription was "about to expire," the medical record confirms that the prescription would not expire until September 4, 2015. (ECF No. 39-6 at 9.) Thus, any failure to renew the morphine on August 25, 2015, was not deliberate indifference.

### September 30, 2015 Visit

Plaintiff saw Dr. Abdur-Rahman again on September 30, 2015, in connection with an appeal, and addressed plaintiff's request to extend the morphine prescription prescribed after plaintiff fell on August 19, 2015. In his pleading, plaintiff complains that the doctor did not extend the morphine prescription or increase plaintiff's Lyrica prescription. (ECF No. 1 at 11.) The medical record from this visit shows that plaintiff was already prescribed 75 mg. of Lyrica twice a day, and that he was prescribed morphine ER 15 mg tablet twice a day for 14 days. (ECF No. 39-6 at 12.) It is unclear when the 14-day period expired. But plaintiff had received the morphine for six weeks following his fall, and Dr. Abdur-Rahman opined that he denied plaintiff's request to refill the prescription because he "did not feel there was a medical indication to continue it." (ECF No. 39-4 at 3.) Plaintiff adduced no competent medical evidence to the contrary; thus, his disagreement with Dr. Abdur-Rahman's decision does not rise to the level of deliberate indifference.

### January 2016

As argued by defendants, plaintiff's verified pleading only raises allegations through September 2015, but in his opposition to the motion, plaintiff raises new claims concerning the provision of morphine in January of 2016. The addition of such new claims at this stage of the proceedings is improper, inasmuch as the gravamen of his pleading is the failure of Dr. Abdur-Rahman to timely provide a walker and provide adequate medical care following plaintiff's fall

20

on August 19, 2015.[10]

For all of the above reasons, the undersigned finds that there is no material dispute of fact precluding summary judgment on plaintiff's claims concerning medication.

### (d) Failure to refer plaintiff to a specialist

It is undisputed that plaintiff was referred for six sessions of physical therapy. At the July 23, 2015 visit, Dr. Abdur-Rahman noted that a possible neurology evaluation would be considered following physical therapy. On August 25, 2015, Dr. Abdur-Rahman noted plaintiff's appointment with a telemedicine neurologist was pending. (ECF No. 39-6 at 10.) By September 30, 2015, plaintiff's neurology consult was still pending. (ECF No. 39-6 at 13.) Because plaintiff had no disease process requiring surgery, "there was no medical indication for a neurosurgical evaluation." (ECF No. 39-6 at 13.) The doctor also planned to order cervical, lumbar and thoracic x-rays for comparison purposes. At each visit, Dr. Abdur-Rahman charted that plaintiff's Parkinson's and seizure disorder were stable. (ECF No. 39-6 at 6-13.) Plaintiff argues that his Parkinson's was not stable, but he filed no competent medical evidence demonstrating that his medical conditions were not stable, or that plaintiff should have earlier seen a neurologist. Plaintiff's disagreement with Dr. Abdur-Rahman's evaluation and treatment, without more, does not evidence deliberate indifference.

---

[10] Moreover, plaintiff's 2016 claims are vague and conclusory. Plaintiff appears to argue that Dr. Abdur-Rahman stripped plaintiff of morphine he was granted through the appeals process by Dr. Lee. (ECF No. 41 at 4.) However, even if plaintiff was granted morphine through the appeals process, plaintiff's pain management is subject to change based on his medical conditions and each treating physician's diagnosis and treatment options. This is evidenced by the treating doctors' morphine prescriptions of limited duration and tapering doses. Also, plaintiff claims that Dr. Abdur-Rahman did not renew the morphine on January 6, 2016, but also claims the doctor took it away on January 16, 2016. (ECF No. 41 at 4.) But plaintiff provided a copy of Dr. Griffith's medical record prescribing morphine ER 15 mg tablet once a day for three days, "tapering dose for only 3 days." (Id.) On January 22, 2016, plaintiff was seen after falling from his walker; an unidentified medical professional's progress note states plaintiff was receiving Lyrica, 75 mg. twice a day, and morphine ER 15 mg tablet once a day for three days, expiring January 23, 2016. (ECF No. 41 at 22.) On January 27, 2016, Dr. Griffith prescribed plaintiff Ibuprofen, 400 mg. once a day as needed for pain, for ten days. (ECF No. 41 at 21.) Such medical records suggest a mere difference of opinion between plaintiff and his treating medical professionals as to the appropriate pain medication he should receive. Accordingly, the undersigned declines to recommend granting plaintiff leave to amend to raise claims based on the January 2016 incidents.

<u>Conclusion</u>

For all of the above reasons, the undersigned finds that defendant Dr. Abdur-Rahman is entitled to summary judgment on plaintiff's Eighth Amendment claims.

### *Was defendant Dr. Lee deliberately indifferent?*

Because plaintiff's Eighth Amendment claims are based on Dr. Lee's review of plaintiff's two administrative appeals, the undersigned addresses plaintiff's Eighth Amendment claims in the context of the appeals.

### (a) <u>Appeal Log No. HDSP HC 15029346</u>

In Appeal No. HDSP HC 15029346, plaintiff sought pain management, to be seen by a specialist, and be assigned a different doctor.[11]  (ECF No. 39-5 at 12.)  Plaintiff complained about Dr. Abdur-Rahman's treatment on July 23, 2015.  (<u>Id.</u>)  It is undisputed that Dr. Lee reviewed and signed the first and second level responses.  (ECF No. 39-5 at 9-16.)  It is also undisputed that both responses partially granted relief.  The first level review noted plaintiff was seen by a different provider for the appeal, plaintiff's Lyrica prescription was increased to 75 mg., and plaintiff was referred to neurology to evaluate plaintiff's Parkinson's disease, seizure disorder, and neuropathy.  (ECF No. 39-5 at 16.)  Dr. Lee also noted that inmates may not dictate what medical provider they see.  (<u>Id.</u>)  In the second level response, Dr. Lee noted plaintiff had been seen by three different medical providers, plaintiff was "prescribed proper pain medicine," and plaintiff "was scheduled to see a neurologist."  (ECF No. 39-5 at 11.)  Therefore, as argued by defendants, the only request Dr. Lee did not grant was plaintiff's request for pain medication.  However, following review of plaintiff's medical records and the radiologist's report of x-rays taken of plaintiff's lumbar spine and cervical spine (neck), Dr. Lee expressed her medical opinion as to the nature of plaintiff's medical condition, and explained why his request for pain management was denied:

---

[11]  Plaintiff did not seek a walker in Appeal No. HDSP HC 15029346, and he included no facts expressing a concern about falling or alerting defendant Dr. Lee to a specific threat of falling. Rather, plaintiff's allegations focused on pain management and his requests for a specialist and a different doctor.  Thus, any alleged failure to further investigate plaintiff's need for a walker cannot be attributed to Dr. Lee's review of Appeal No. HDSP HC 15029346.

> With regards to your back, you have minimal chronic wedge compression and minimal degenerative changes. With regards to your neck, there was no misalignment (the bones are in place) and degenerative disc disease (DDD). . . .
>
> Be advised that gradual deterioration of the disc between the vertebrae is known as degenerative disc disease (DDD). As we age, the water and protein content of the cartilage in the body changes, which results in more fragile and thin cartilage. Both the discs and joints that stack the vertebrae are composed of cartilage and subject to "wear and tear" over time. Hence degenerative disc disease is not truly a disease; it is a term used to describe the normal changes in your spinal discs as you age. DDD is treated using a number of different modalities. It is a process that cannot be cured. Surgery is a treatment of last resorts due to the extreme risk and limited benefits.
>
> No pain management regimen can be expected to provide you with no pain without inordinate side effects, either short or long term, and "no pain" is therefore not a reasonable goal. Rather, your goal should be to achieve a level of pain control that allows you to function in your activities of daily living. This is the safest and most appropriate approach to pain management. Your treatment has been appropriate to date as the most highly recommended medication for this condition is Tylenol. Ibuprofen is a second-step medication. You are currently receiving significant medication for your condition as you are receiving extended release morphine 15 mg twice a day at this time and Lyrica 75 mg twice a day. No change is indicated at this time.

(ECF No. 39-5 at 11.)

In his opposition, plaintiff points to no additional investigation or action Dr. Lee should have taken in response to Appeal No. HDSP HC 15029346. Plaintiff adduces no competent medical evidence demonstrating that Dr. Lee's medical opinion in denying plaintiff's pain management request "was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332. Rather, plaintiff's challenge to Dr. Lee's responses to plaintiff's appeal constitutes a mere difference of opinion that does not rise to the level of deliberate indifference. Snow, 681 F.3d at 987 (citation omitted); Wilhelm, 680 F.3d at 1122-23 (citing Jackson, 90 F.3d at 332).

(b) Appeal No. HDSP HC 15029462

In Appeal No. HDSP HC 15029462, plaintiff sought a wheeled walker with handbrakes and a seat. (ECF No. 39-5 at 19-22.) However, by the time Dr. Lee prepared the first level response on October 21, 2015, plaintiff had already received the walker on September 30, 2015.

23

(ECF No. 39-5 at 19.)  Thus, there was no further investigation or action to be taken in connection with plaintiff's need for a walker at that time.  Thus, plaintiff's claim against defendant Dr. Lee in connection with her review of plaintiff's appeal seeking the walker should be denied.

Conclusion

For all of the above reasons, defendant Dr. Lee is entitled to summary judgment on plaintiff's Eighth Amendment claims related to Dr. Lee's review of plaintiff's administrative appeals.

## VII.  Unauthorized Sur-Reply

On August 26, 2019, plaintiff filed an unauthorized sur-reply to defendants' reply.  The Local Rules do not authorize the routine filing of a sur-reply.  Nevertheless, a district court may allow a sur-reply "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief."  Hill v. England, 2005 WL 3031136, at *1 (E.D. Cal. 2005); accord Norwood v. Byers, 2013 WL 3330643, at *3 (E.D. Cal. 2013) (granting the motion to strike the sur-reply because "defendants did not raise new arguments in their reply that necessitated additional argument from plaintiff, plaintiff did not seek leave to file a sur-reply before actually filing it, and the arguments in the sur-reply do not alter the analysis below"), adopted, 2013 WL 5156572 (E.D. Cal. 2013).  In the present case, defendants did not raise new arguments in the reply brief, plaintiff did not seek leave to file a sur-reply, and his arguments therein do not impact the court's analysis.  For these reasons, the court strikes plaintiff's sur-reply.

## VIII.  Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that the Clerk of the Court is directed to strike plaintiff's unauthorized sur-reply (ECF No. 43).

Further, IT IS RECOMMENDED that:

1.  Plaintiff's Eighth Amendment claims against defendant Lee based on her role in the 2015 RAP be dismissed based on plaintiff's failure to exhaust such claim; in all other respects, the motion on exhaustion grounds (ECF No. 39) be denied; and

////

2.  Defendants' motion for summary judgment (ECF No. 39) on plaintiff's remaining Eighth Amendment claims against defendant Dr. Lee, and all of plaintiff's Eighth Amendment claims against defendant Dr. Abdur-Rahman, be granted; and

3.  The Clerk of the Court be directed to enter judgment and terminate this action.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  December 30, 2019

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/carr1292.msj.fte.med